Before we begin our regular order today, I will turn to our colleague, Judge Wallach, for a motion. May it please the court. This is one of those most pleasurable moments. I have two of my clerks here for whom I'd like to move in mission. The first of them is is Phillip Lee. Please rise, Mr. Lee. Mr. Lee is a member of the Bar of California, the District of Columbia, and New York. I know of my own personal knowledge that he is of good moral character, that he is knowledgeable, and that he would be a wonderful attorney as a member of our Bar. Both of these candidates say I've had the pleasure of working with Judge Wallach, so I can second your observation and grant the motion. I gladly join the motion. Thank you. Mr. Lee, you may be seated. I'm going to move Ms. Bond, and then you may be sworn in again. My second motion is for Emma Bond, who is a member of the Bars of New York and Maine. And again, I know of my own personal knowledge that she is of high moral character, and that she is a very knowledgeable person, and that she will be an excellent member of the Bar. Again, I join you gladly. Do you solemnly swear or affirm that you will comport yourself as an attorney and counsel of this court, uprightly and according to law, and that you will support the Constitution of the United States of America? I do. Congratulations. Get back to work. The first case this morning is 133155, Klausch v. Ms. T.D., Mr. Eisenberg. Madam Chief Justice, Your Honors. Please judge, I'm sorry. I don't mind the promotion. Forgive me. Your Honors, if it's okay with the court. I believe the issue here today is whether or not the board and the misdemeanor judge below acted arbitrarily and capriciously, and that harmless error can't be used here as a waiver to excuse the agencies for its behavior. In restoration cases, along with the ADA, harmless error is not a factor to be considered. It is per se arbitrary and capricious when the agency doesn't follow its own rules and regulations in implementing the ADA. Let me ask you a question. On page 20, footnotes 5 and 6 of your opening brief, you assert that William Rice Station was short on clerks and Ms. Faust's restrictions would have allowed her to carry on the task required of a clerk. And then in your next footnote, you argue that it is, I'm quoting, standard practice to place injured, partially recovered employees on the floor as a 204B supervisor, and there's no indication that the agency considered that sort of work from Ms. Faust. Where's the support for that in the record? The support for what, sir? For your statement that it is standard practice to place injured, slash partially recovered employees on the floor as a 204B supervisor. I believe that came from my client during her depositions. And where is that in the record? No, I'm sorry, strike that. All right. No, I misspoke, but I can address that, and I think I know where you're going with this, if I may. Well, where I'm going with it is, if you listen to what I said, where is that in the record? Specifically that? Yes. That is not in the record. What is in the record is that my client has asked for, before the administrative judge and the board below, for jobs inside. We're not creating a new issue here. We're not creating a new argument. We're coming forward with a natural flow of what was discussed below. Wait, wait, wait. Let's go back to what you said to me. Yes, sir. That is not in the record. Yes, sir. That's a quote. You have a statement in here that it is standard practice to place these people. You can't do that. Your Honor, we mentioned elsewhere, and I don't remember off the top of my head where in the brief, but we did mention that the client, forgive me, petitioner, revered. Yeah, you say that. She reversed. So what? You can't. It's or the record. You know what that means? No, sir. It's outside the record. You can't do it. Yes, sir. Here it is. But even if that information is not allowed in the record, even if that information just simply doesn't exist, it's not relevant. It's not relevant because... Then why is it in your brief? We were using this as an example, sir. Okay. We weren't trying to mislead or... I'm not saying you're trying to mislead. I'm saying that it's improper practice. Yes, sir. But what is it that the agency did wrong? They sent out emails that were not limited to vacant positions, but asked whether there was work that she could do, and they sent them out to many, many people. What should the agency have done that it didn't do? If I may, let's be very clear on what the agency did do. Over the course of 10 days, roughly 10 days after she's provided the notice to the agency, they conducted two email spam searches, and they did one comparison list. They are supposed to provide the petitioner positions wherever, whenever they're available. It is disingenuous to argue that there are consistently looking for positions that my client could do with two emails over the course of 10 days, and comparing the jobs list that is two years old, when it's whenever available, you can't look at a job list two years old. My understanding, I've read those emails, that they asked whether it was work that she could do, and spelled out what her limitations were. So I'm still not clear as to what they were supposed to do that they didn't do. Well, one, they had to be a little bit more consistent with the emails that they were sending out. What do you mean consistent? More plentiful. They needed to do it more than just twice over the course of three months, which actually was twice within 10 days over the course of three months. Who said they had to do it more than twice? What case says that? What case says you have to do it more than twice? I don't believe there's any case that's on point. It says whenever a job becomes available, and whenever a job becomes available, you can't tell that from the following week, the following month, or the following weeks, that a job has suddenly become available that she could do if the agency isn't at least regularly looking. So they have to do it, what, in your view, every week? I would say every week, at most two. Okay, so apart from that, what else did they do wrong? They also failed to do an analysis as to what jobs could be modified, and it doesn't have to be her job. It could be any job. The ADA and the – sorry, correct the name of the other act. The Rehabilitation Act. Thank you, ma'am. The Rehabilitation Act required that the agency look at all possible jobs that could be modified that would allow her to return to work. They didn't do that. The record is void of that. Well, they did ask about work. They didn't ask about positions, right? The emails asked about whether it was work she could do. Which would imply that they're looking for a specific position, but they don't talk about modifications. Well, I don't know why you read that as addressing specific positions. They didn't say, is there a position she could fill? They said, was there work she could do? Again, but they only did it twice, over 10 days, while my client was out for three months, and then when she returns. Well, first, actually, I'm going to go back into what you were saying about the work. The agency's never offered any rationale. They've never argued, well, oh, yeah, well, when we say work, we mean anything. We just simply said, we sent this out, and that's that. And therefore, we met our obligations. But it's supposed to be an engaging process between the injured worker and the agency about getting her back to work, whether it's a modified position or a position with reasonable accommodation. She could have done her job had she been given an air-conditioned vehicle, which just constantly and mysteriously disappears here and there. The agency inaccurately noted in its record, or in its brief, excuse me, that my client, at the time of her attack, was in an air-conditioned vehicle. That's not the case. There is nothing in the record that reflects that. Well, at the time that these emails were being sent out, did your client say, you're not doing enough, you should do something more? She tried working with them. What is she supposed to do if the agency is not willing to work with her? Well, I don't think that's really responsive to the question. Did she say, these emails are not sufficient, you should do something different, you should do it more often? Did she raise the question of whether emails should be sent more often? I'm not sure in the record if she was aware of the emails being sent. So I'm not going to articulate something that I'm not sure or confident about providing a fact before the court. So there's nothing in the record to show that she said, you're not doing what's required and you need to do something different? I don't recall. I'm not saying one way or the other. Okay. Is there a specific point that... No, no, go ahead. Okay. Forgive me, I lost my thought. The issue is still whether or not the agency did everything it had to under the AD and the Rehabilitation Act. It can't just simply send out a couple of emails and look at a comparison list to see if there are any jobs available. And mind you, they looked at a two-year-old list. That's not enough. It has to be an interactive process. It has to be an engaging dialogue. You ask, well, did my client contact the agency to say, hey, these two emails are not enough? Where was the agency in contacting my client? Where were they in an engaging dialogue? My client already feels shunned. She already has, unfortunately, several other EEO cases. And, you know, she's not getting any help. She's being attacked. So who is she supposed to go to if the agency is not going to assist her? She's being attacked? Yes. I don't mean physically with a knife, but she is being placed in situations that are putting her health at great risk. Now? I thought this had to do with what her situation was before she returned to work. She's back at work now, right? She's back at work. And she's now under, after she returned, she was put back on medical restrictions, given a limit. Had she returned without medical restrictions? Sorry? I thought she returned without medical restrictions. She did return without medical restrictions. Since then, she then has had medical restrictions imposed upon her. So that's another thing that's outside the record here. Well, with all due respect, that's not part of this case. What I was addressing was, Judge, sorry, I know my glasses, was how she's being attacked. I'm not trying to introduce new evidence. I'm just trying to answer your question, sir. But she's constantly being denied and harassed an air-conditioned vehicle to which it has been prescribed to her by her doctor. But you just said that that has nothing to do with this case. Yes, Your Honor. So maybe I'm getting tangled up. Forgive me. Go ahead. But what I am saying is that looking at what the agency did or didn't do is the issue. What the agency didn't do was follow its own regulations. It has to look for a job whenever available. That cannot be simply once or twice over the course of 10 days. You're too weak at the outside requirement that you proposed, that at least every couple of weeks they have to send out a notice. Remember saying that to Judge Dyck? Yes. Once every two weeks. Yeah. You thought that was the outside limit. Yes. But you don't have any authority for that. I assume that what you're saying is it's your belief that anything beyond that is not reasonable. Yes, that much I would absolutely agree with you, Your Honor. Okay. You agree that that's what you're saying? Yes, Your Honor. Because that's my question. So you understand our standard of review of the findings below that in order to determine, to reverse, we have to determine that what they've done is not supportable by the record. How is your personal belief in reasonableness supported in any fashion, either by the evidence or by the law? Because if I recall correctly, if you look at White with the Supreme Court, any activity that would dissuade an injured individual under the ADA or the Rehabilitation Act, dissuade that individual from participating in the EEO process. And by not looking for a job, given that she already has prior EEO, given the fact that there was clear retaliation, if I may, when she – the day after she filed her EEO complaint, that is when – the day after is when they stop searching. Yes, Your Honor. Your time is almost up, so why don't we hear from the government? Yes, Your Honor. So you're splitting arguments? You're splitting your time? Yes, that is correct. May it please the Court. There is no unconditional right to restoration. In this case, Ms. Faust was afforded her partial restoration right, consistent with the regulation, and the Board correctly determined that she failed to raise a non-frivolous allegation that the denial of her restoration was, in fact, arbitrary and capricious. We respectfully request that the Court affirm the Board's decision for the following two reasons. First, the agency conducted a proper search here. They looked for available positions and work, including tasks, to see whether or not they met – I only have one question, and it's for both of the government counsel. It seems to me that there is some implication, at least, in the red brief and the green brief, that Ms. Faust's claims were not well-founded. The reference to the temperature on the day and the cloudiness of the day referenced air conditioning and so on. Given the findings below, how is that possibly relevant here? I think in terms of the findings by OWCP, the relevance of the findings to OWCP go to the first prong of the jurisdictional test to determine whether or not the person can be partially restored. Are we challenging the immediate factual determination that she was indeed suffering from some sort of heat-related disability? The short answer is we're not challenging at the time because she had a compensable injury. Because on December 15, 2011, OWCP essentially reversed initial findings because of due process. In fact, she was eligible for restoration because she had a compensable injury. But if you actually look at the facts in time as they occurred, which is important here, so it's a little bit different maybe than your run-of-the-mill partial restoration case, because on – I think it's on page 153 of the record – on September 15, 2011, it says in there that her compensable injuries – basically her benefits were going to be rescinded. That the Department of Labor essentially agreed with the agency that, in fact, she didn't have a compensable injury. And she was told that – Okay, fair enough. You answered my question. I wanted to know why that was possibly relevant. Okay, fair enough. And to go one step further and tacking on to what Mr. Eisenberg was saying, I think it's fair to look at the record and look at the timing of these events. As I just said, the agency conducted the proper search. They conducted a search August 7th when she was in the William Rice office. Then she was subsequently reassigned to the Alameda office. Her new supervisor, Ms. Williams, conducted another search, give or take, about August 18th. Then if you look two weeks later, which Mr. Eisenberg said is reasonable, Ms. Faust was told that she no longer had a compensable injury. So at that present time, the agency knows that she doesn't have a compensable injury, so she's no longer eligible for restoration. So maybe that is – I think it's fair to conclude and reasonable under the circumstances of this case. That is why there were no further searches done. However, fast forward to December, whatever happened essentially in September became irrelevant because OWCP said that she was essentially eligible for a compensable injury. Can I ask you to back up a moment? I think underlying all of this is some board decisions, which I view as pretty confusing. The Latham decision, the Taylor decision. Obviously, if there's a vacant position, they have to search for a vacant position. But what's unclear about this is to what extent the agency has to look for a position that could be modified to accommodate. As I understand it, the Rehabilitation Act incorporates the ADA standards, so there would have to be a reasonable accommodation, whatever that might be in the particular case. But under the ADA, modifying a position to accommodate someone with a disability is something that is required. I'm not sure that the board is recognizing that in the Latham case. I think the question is in searching for these positions, doesn't the agency potentially have an obligation to say, well, is there a position that could be modified to accommodate the limitations that this individual has? And while there was a request to see if there was work that could be done, there's a certain lack of clarity in that. And perhaps agencies should have said, is there a position that could be modified so that this person could perform the essential duties of that position? Your Honor, I think under Latham, the board essentially, the gist of Latham was that not only do they need to follow, I think I'm answering your question, not only do they need to follow the partial restoration regulations, that basically requires agencies to treat employees substantially the same as they would under the rehabilitation. Yeah, but that's what I'm not sure about. I find Latham pretty confusing. In paragraph 50, it talks about we agree with the administrative judge, the creation of a unique position to fit an individual's medical restrictions is not a reasonable accommodation. Well, I don't know exactly what that means. I mean, if there were some, if a position could be modified in a minor way consistent with the ADA requirements so that the person could perform in that position, that would be required under the Rehabilitation Act, wouldn't it? Yes, I think the agency is required to look for a position, and Latham took it one step further, not just a position, but available tasks, because that made it consistent with the postal service rules. But yes, they do need to look at available positions that can be modified, but I think- But that's not what, Latham didn't say that very clearly, point one, and point two, the emails here that were sent out didn't make that very clear. Well, whether or not, I mean, Latham is clear to that point. I think overall what we need to focus on in this particular case is what available tasks, jobs could be modified that could fit within her medical restrictions. Yes, but why not send out an email saying the ADA requires us to provide reasonable accommodation for this employee? Are there any jobs that could be modified to achieve a reasonable accommodation to suit this employee's limitations? I mean, why not be more explicit about it than the agency was here? Sure, I understand your concern, Judge Dyke, and possibly Ms. Kinmiller, representing the Postal Service, might be able to shed more light to answer your question more specifically, but I think- But I'm also questioning what the Board is doing. I don't think the Board is clear about this. I know you read Taylor, you read Latham. I mean, I just don't think the Board has articulated a very clear line for the agency to follow. That's part of my problem. I can understand that, Judge Dyke, but I think in this particular case, I think- Let me throw out a question at you, too, so you can answer both of them together. When a postal shop, whatever you call it, the people within the 50-mile radius get that email, do they know that it's an accommodation email, that they're getting told, we're trying to place somebody? Sure. So do they know that they may have to modify slightly in order to accommodate? To be honest, I don't know the answer to your question. Or maybe Ms. Kinmiller can. Possibly, but I think it's important. If you look at the Postal Service rules, specifically 546, it specifically sets forth how the agency's supposed to look for jobs for someone that's partially restored. And if you match up what's under the rule in 546, it's consistent with essentially paperwork. I think it's on page 106 and 107 of the record, and 96 and 97 of the record, that Ms. Butler and Ms. Williams both respectively filled out, that essentially mirrors what 546 says. But you need to essentially look, and I'm paraphrasing, inside your craft, outside of your craft, inside your duty station, outside of your duty station. So I think in this particular case, when the email is sent out by managers, they're essentially following the internal rules that basically refers to these types of partial restorations. But maybe the internal rules aren't as clear as they should be, just as the board's decisions aren't as clear as they should be. Perhaps under these circumstances, the email should say, here are the limitations, we were obligated to make a reasonable accommodation, are there any jobs that she could fill if a reasonable accommodation were made? It seems to me that dealing with people who are partially recovered, they would benefit from some clearer statements, both from the board and from the agency, as to what's required. Sure, I definitely can understand, you know, your concern, Judge Steichen, and this is a little bit off topic, but if we're here, I think the other thing, too, is that when an employee makes a request for a reasonable accommodation to an agency, they don't need to use the magic words. I'm making a reasonable accommodation request. The agency needs to look at the totality of the circumstances and determine when an employee brings medical restrictions and says, I can't do my job, can you help me? They're supposed to look on the basis of the facts, whether or not that request is actual reasonable accommodation. So under that guise, if you look at the emails that were sent by the Postal Service, essentially that's kind of what they're doing. It doesn't have the magic words. Kind of what they're doing. That's the problem. Kind of what they're doing. Well, sure, kind of how they're doing it. But I think what I'm getting at is that I understand it would be definitely clearer if this employee is seeking a reasonable accommodation, this is her limitations, do you have any work? Yes, definitely that would make it more clear. But I think under these circumstances, and again, Ms. Miller could maybe shed some more light on this, but I think it's fair that what the agency was doing was really essentially trying to accommodate her. And in terms of the accommodation here, really this case is about the search. Whether or not the search was arbitrary and capricious. As the administrative judge said, Ms. Faust did not challenge the fact of the search, where it was conducted, or its results to claim that the doctor's restrictions were somehow not really the doctor's restrictions. In other words, Ms. Faust has failed to meet her burden to establish by a non-frivolous allegation that in fact the search was improper and therefore arbitrary and capricious. And if the court has no further questions, we respectfully request that you affirm the board's decision. So I answer all our questions. May it please the court. And the first one of those is why can't the agency be clearer in sending out emails so that it tells the people in the field what the standards are under the Rehabilitation Act, which incorporates the ADA standards? Well, Your Honor, these emails were clear and in fact more detailed. You're kidding. They're not clear. Yes, I'll explain why. They were in fact more detailed than an email that would have asked about modifying jobs. Give us a page reference. Yes, the emails focused upon, let's look, there were two sets of emails. So we'll look first at page 196, which was the email from Tracy Williams. Yeah, the employee A1. I thought that was, okay. She, pardon me, the employee 1801 is how she referred to Ms. Faust. She looked for, she said, first, I have a limited duty employee. So as to the question whether the recipients of the email know that this is something related to a disability, limited duty is special terminology within the Postal Service that refers to individuals who have partially recovered from a compensable injury. So that's a notification there to the recipients. We're dealing with somebody who has a disability there. And then she said, look, that the employee is available for work and asked whether the facility has available work for the following employee. And that is consistent, focusing on work, which is more specific than some sort of position. That's consistent with the Postal Service's internal rules and regulations, which give employees even greater protections than OPM's regulations. I understand what your argument is, but it seems to me difficult for you to argue that this is clear. I mean, what these emails perhaps should have said is that the ADA requires that reasonable accommodations be made in the position. In addition to asking whether there's work available, is there a position that with reasonable modification she could fill with her restrictions? And that would help the recipients of the emails understand better what is required. I think it's very difficult to argue that this is clear. It may be sufficient, but I don't think it's clear. And before you answer, again, let me interject the same question I asked. And that is, do your folks have some sort of jargon knowledge that makes – do they have an internal knowledge that makes it clear to them? Well, again, I noted that both of the emails, the other set and examples at page 110, both use that phrase, limited duty. Now, we don't have in the record, for example, testimony from the recipients of the email telling whether they understand that or not. But limited duty does have a very specific special meaning within the Postal Service, and that does mean – What shows us that in the record or anywhere else that we can look at on review? The meaning of limited duty. The – I believe it's in the ELM, the Employee Labor Relations Manual. And this is not in the appendix. It's been incorporated by reference into the federal regulations because it's so voluminous they don't reprint it. But, for example, ELM section 546 talks about limited duty under the heading of disability partially overcome. Now, there are other places as well. I don't believe that's the best place to point you to, but that's the one that I'm most able to find quickly right now. What she's saying is this doesn't tell people that if you have a delivery with a van that's not – or a truck that's not air conditioned, that you should give her an air conditioned truck. It's just not clear about that. How can you say that it is clear that the recipients of this email would understand that that's what they're supposed to do? Well, they would understand from this email that they are to look for work, for tasks. And the administrative judge and the board found that they – A task to be seen as delivering mail in an un-air conditioned truck, which is not a task she can perform. Right. Well, the email didn't restrict the type of tasks that the recipients were to consider aside from the medical restrictions, but left it open to the managers who received that email and who are most familiar with the particular work that's done in their facilities to look at these restrictions and considering their knowledge. You're saying the very precursor is 78 to 85 degrees so that they have to filter the task through the work requirement and start with that very beginning. So if there's not an air conditioned truck, for example, you don't fall into that category. That work is not available. That's right. I mean, the recipient's right. It would read the medical restrictions and then working from those, do we have anything? Fair enough. Now, a quick point on the air conditioned van. I do just want to clarify that the record does, in fact, show that Ms. Faust had an air conditioned van at the time that she suffered her heat stroke. That is at page 92 of the record under patient history. Her van had functioning air conditioning on the day in question. Also in the record at page 63, there's a discussion of the consideration that the agency did give to trying to modify Ms. Faust's existing position but concluded there were no job accommodations that would enable her. I noted when I looked at that, it also said that it was 74 degrees, although the green break seems to say 84 degrees. The outside temperature? I say ambient versus ambient. Okay, fair enough. And just one other quick clarification on the facts. Ms. Faust's representative this morning had said that the agency stopped searching the very day after she filed her EEO complaint. But I just want to point out that the, I suppose while technically true, the facts are that the agency made a certification of completing the second search on the 18th of that month. That was the 18th of August. On that same day, Ms. Faust filed her EEO complaint. So it's not as if the agency had some search that was in process, but it suddenly stopped because the EEO complaint was filed. The second search had come to completion by the time that happened, and of course the board found no allegations to substantiate any claim of discrimination or retaliation. Thank you. Time is up. Thank you. We've gone over to the other side, Mr. Eisenberg, so we'll add another four minutes to your rebuttal time if you need it. Forgive me, I didn't hear you. We've gone over asking questions of the other side, so we will add another four minutes to your rebuttal time if you need it. Excellent, thank you. Your Honors, if I may, first of all, we've discussed vague emails. If my client is not afforded the due process in her return to work, how is it then that the agency can sit here and say that she's been afforded the due process she's entitled to and being returned to work under the Rehabilitation Act? That email, I don't see any of the words reflecting to, can you modify any positions so she can go back to work? I don't see how these jobs, where it's being discussed, how these jobs can be altered. I don't see where there's discussions of jobs other than postal delivery. We keep hearing, I mean, that's all we've been hearing in the time that the government's been up here is, you know, the postal delivery. But there are more jobs and more tasks that can be done outside. You say this email's vague, but are you familiar with the manual Ms. Kidd-Miller cited? She cited 546, but that or other provisions that she says inform the recipients? Pretty much, I didn't understand the question. Are you familiar with the manual cited by Ms. Kidd-Miller that she says informs the recipients with which they're supposed to be familiar so that when they receive an email like this, they read it in light of their other required knowledge? I'm not sure where I see how that email ties directly to that portion of the ELM. There's nothing in there that I saw, unless I'm forgetting something, that directly tied the two together. I believe it was Judge Dyke who said, hey, why didn't you say something about an ADA action here or a rehabilitation issue here? All it said is, hey, we've got this employee with these conditions. Can anyone put her in a job? What I didn't see was sort of the reverse. Is there a job that can be modified that would fit these conditions? When she searched out, there's no search within that particular station. But where is Section 546 in the record of the manual? I'm not sure yet. I guess I'm confused by your question. My understanding from Ms. Kim Miller was it was incorporated by reference. Yes. My question is, where is it set forth in the record? Where can I see that provision of the manual in the record? I believe that provision of the manual is also reference. I believe there are some comments by both sides. We're quoting certain provisions, but I don't believe there is a complete attachment of that provision. Okay. If I'm understanding your question correctly. Your Honors, again, the agency's never offered any rationale as to explain a variety of their deficiencies, which includes, as I mentioned, using a two-year-old task worksheet to find available work for my client. I guess the problem is why doesn't the employee have an obligation to complain at the time that what's being done is insufficient so that there can be collective action if necessary? I mean, there does seem to be a risk of sandbagging if the employee doesn't raise these problems with the agency at the time the action is being taken. Who is she supposed to complain to? Her supervisor. The search that you're making is insufficient. I see my time has run. If I may respond, where in the regulations does it say that the employee has to keep going back at the supervisor and saying, hey, how come I haven't heard back from you regarding another search or more searches or with an insufficient search? How many times does the employee have to go back to where does it kind of cross the threshold? Well, I think there are cases, I'm sure, that say that an employee is supposed to release their available positions that weren't offered as an obligation at the time to identify those positions. Perhaps. Unfortunately, we have to look at the four corners of this entire situation given the fact that she has other prior EEO complaints that is being unaddressed by the agency. When does it become an issue of futility for the injured worker? Thank you. Thank you. Cases submitted.